## Karr v. Ray et al.

(Decided February 7, 1930.)

HAZLEWOOD & HAMM for appellant.

R. B. JOHNSON for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Paris Karr was unsuccessful in the trial court, and
has appealed. He sued Will Ray, Calla Ray, Harve
Lloyd, and George Lawson, and charged them with
having entered upon the land of the plaintiff and having
cut down and converted to their own use valuable timber
thereon; with having destroyed the crops growing
thereon, and other similar trespasses. All of the defend-
ants fade out of the picture except Will Ray, and, to
avoid repeating unnecessary names, we shall treat this
as a contest between Paris Karr and Will Ray.

The principal question involved in this controversy
is the location of the property of Paris Karr, and, in
order that this opinion may be more easily understood,
we have from the plats in the record prepared a plat of
the premises, and have located the Karr tract as the trial
court probably located it, and have also tried to locate the
Karr tract as he insists it should be located.

There are three patents involved in this controversy.
We shall begin with the youngest, which is patent No.
69451 for $11^{78}/_{100}$ acres which was issued to Paris Karr
on the 7th day of August, 1920. It is inclosed on the map
by heavy solid lines, and, to more sharply call it to atten-
tion, it is shaded in with parallel lines drawn thereon.
This tract is thus described:

> "A certain tract or parcel of land, containing
> $11^{78}/_{100}$ acres, by survey, bearing the date 14th day
> of August, Nineteen hundred and eighteen, lying and
> being in Laurel County, adjoining the lands of
> Moren, and Reams, Needles, Paris Karr, and Ellean-
> der Coal & Iron Co. Beginning on a stone in Moren
> & Reams line; thence with their line N. 85 E. 28 poles
> to a stone in Moren & Reams line, continuing with
> their line N. 62 E. 36 $^3/_{11}$ poles to a chestnut stump,
> Moren and Reams corner, also Needles corner, thence

with Needles line S. 11 E. $30^2/_3$ poles to a stone; thence S. 25 W. $26^6/_{11}$ poles to a stone, in Paris Karr's line; thence with his line N. 65 W. $59^{19}/_{33}$ poles to a stone, Karr's corner; thence N. 3 W. 11 poles to the beginning.''

The next patent involved is No. 35751, which was issued to Alston Clark on November 23, 1864. It lies

immediately north of the Paris Karr patent, and is inclosed by heavy solid lines. It is thus described:

"A certain tract or parcel of land containing one hundred and twenty acres, by survey, bearing date the 3rd day of March, eighteen hundred and sixty, three lying and being in the County of Laurel on the Laurel Branch of Laurel River and bounded as followeth, to-wit:

"Beginning at two poplars and two white oaks, an old corner; thence N. 58 W. 20 poles to two spotted oaks; thence N. 10 E. 56 poles to a white oak; thence N. 88 E. 42 poles to a white oak; thence S. 11 E. 37 poles to a black oak; thence S. 35 E. 34 poles to a poplar; thence S. 22 W. 92 poles to a white oak; thence S. 45 E. 26 poles to a chestnut; thence S. 60 W. 32 poles to two white oaks; thence N. 83 W. 91 poles to a white oak; thence S. 59 W. 48 poles to two white oaks; thence N. 41 W. 80 poles to a black oak, thence N. 13 E. 24 poles to a black oak, thence N. 78 E. 62 poles to a gum; thence N. 34 E. 35 poles to the beginning."

William Ray claims to own $55^{32}/_{100}$ acres lying principally within this Clark patent. It is inclosed on the map by a series of short dashes, and it is thus described:

"A certain tract of land lying and being in Laurel County, Kentucky, and being the same tract of land conveyed to the party of the first part by J. W. Moren, and Nancy Moren, by deed bearing date 1st day of January, 1918, which is duly recorded in Deed Book No. 55, at page 540, Laurel County Court Clerk's office."

"Beginning at a white oak; thence S. 42¼ E. 26 poles to a chestnut; thence S. 62 W. 35 poles to two white oaks; thence S. 85 W. 60⅝ poles to a white oak; thence N. 33 W. $83^1/_3$ poles to a black oak; thence N. 15 E. 24 poles to a black oak; thence N. 85 E. 62 poles to a gum; thence S. 83½ E. 51¾ poles to the beginning, containing $55^{32}/_{100}$ acres, be the same more or less."

Paris Karr owns the Elijah Wiggins patent, No. 24256. It is shown on the map by heavy solid lines, and lies south of the Paris Karr patent, and there is marked

on the map the calls of this patent just as they are given in the original paper, even to the erroneous spelling of "holly." This tract is thus described:

"A certain tract or parcel of land containing one hundred and fifty acres, by survey, bearing date the 11th day of Aug. eighteen hundred and forty, lying and being in the County of Laurel on the west side of the State road and on the Ivy Branch waters of Laurel and bounded as follows, towit: Beginning on the west side of said branch at a white oak, pine and holley; thence S. 5 W. 56 poles to a white oak; thence S. 5 E. 70 poles to a white oak and chestnut; thence S. 75 E. 28 poles to a White oak; thence S. 27 E. 56 poles to a black oak; thence S. 26 W. 40 poles to a black oak: thence S. 43 E. 42 poles to two gums; thence N. 36 E. 66 poles to a black oak on the west side of the aforesaid branch; thence S. 37 E. 50 poles to two sourwoods and gum; thence N. 17 E. 100 poles to a forked white oak and two black oakes bushes; thence N. 30 E. 116 poles to a stake; thence N. 70 E. 116 poles to the beginning."

This controversy has grown out of the correct location of this Wiggins patent, and upon the location of it hinges this entire controversy, for it is older than either the Karr patent or the Clark patent, and those patents must give way to it in event of an overlap.

Paris Karr undertakes to locate this Wiggins patent by placing the beginning corner about 75 poles north and about 35 poles west of where we have located it, and, to better illustrate his contention, this map undertakes to locate this patent as he contends it should be located by a series of dotted lines on the map we have made of the premises.

Neither Ray nor Karr connect very well with the patents under which they are claiming, but it is not necessary for us to go into that feature of this case, for, by treating both litigants as though their deeds connected them perfectly, with the patents under which they claim, still Karr must lose, for he has failed to show that this Wiggins patent is located where he contends it should be located, and Ray has succeeded in producing evidence that satisfies us that the trial court was correct, and that this Wiggins patent is located just as it is located by heavy solid lines on the map south of the Paris Karr patent.

The description given of this Wiggins patent will not close. The call for the tenth line is north 30 east 116 poles, yet on this map we have drawn it north 30 west 116, and the call of the eleventh line is north 70 east 116 poles, and on this map we have drawn it north 70 west 116 poles. There is in this record a certified copy of the original plat upon which this Wiggins patent is issued, and that copy has the same general outline as has the plat we have made. All the surveyors that testify in this record seem to agree that these two lines, north 30 east and north 70 east, should be north 30 west and north 70 west, in fact, that is the one thing upon which these two litigants themselves were able to agree.

Laurel river should be shown on this plat on the southern part thereof, and running in that general direction which a mariner would call south, southwest. There is in the record no measurements or data from which to do so, and, although he was directed to make such observations and report them, Mr. Pigg, when surveying this property under order of the court, failed to do so, but just arbitrarily locates this stream without giving any measurements or data from which to locate it. For the reader it will be sufficient for us to say that this stream runs practically parallel with the ninth line as located on the map, and that corner No. 8 would seemingly be near this stream. There is a branch that crosses the Clark patent and runs through the Wiggins patent; there is no data from which to locate this stream, except that corner No. 1, as this map locates it, is about 10 or 12 feet west of it. This stream is known as Ivy branch, and into this stream, about 10 or 12 feet from where the map locates corner No. 1, there empties another stream known as Adam's branch. On the plats before us Ivy branch is just arbitrarily given a general direction which a mariner would call south-east by south. Adam's branch is arbitrarily given a general direction of practically west to east, and corner No. 1, as this map locates it, is in the low land just north of where Adam's branch empties into Ivy branch, and about 10 or 12 feet from these two streams.

For Ray et al. it is contended the correct location of the beginning corner of this Wiggins patent is situated on the west side of a stream known as Ivy branch, and just north of where the Adam's branch empties into it. This we shall call the southern location. Karr claims

the true location of his beginning corner is at a point on the west side of Ivy branch, but some little distance from it. The best we can tell is that the location claimed by Karr is about N. 14½ W. 85 poles from the southern location. This location claimed by Karr to be the correct one we shall call the northern location.

When Karr bought his property in 1917, he had it surveyed by O. G. Taylor, who started at the southern location, surveyed around the patent, and made a plat thereof. In doing this he found a piece of vacant land between the Wiggins patent and the Clark patent. Karr took the necessary steps, and on August 7, 1920, a patent for this 11$^{78}/_{100}$ acres was issued to him.

In order to succeed, Karr must show there is a lap of these two surveys, and that a portion of the land patented to Clark had been previously patented to Wiggins.

Alston Clark, a man 99 years old, the patentee of the tract, a part of which is now claimed by Ray, testifies in this case. He is a first cousin of Elijah Wiggins, and years ago lived on this Elijah Wiggins patent. He says that the land he patented had previously been patented to Elijah Wiggins, and that the Elijah Wiggins patent covers all of it but about 20 acres.

We find the old man's evidence much confused, and he testifies he never got a patent at all, but such a document is in this record.

Elijah Wiggins died in Missouri. The exact date of his death is not given, but, after he died, his father by parol gave this Wiggins survey to Alston Clark, and it is not reasonable to suppose that Mr. Clark, who was thus then the owner by parol gift of the Elijah Wiggins patent, would have laid another patent over it. We are not impressed by his evidence about this lap. He does remember the timber standing at the beginning corner of the Elijah Wiggins patent.

He describes the beginning corner of the Elijah Wiggins survey as a white oak, pine and holly, and that he was there in 1922, that the oak and holly were standing, but the pine had been cut down. He located these trees as standing on the west side of Ivy branch near the forks of the branch. When asked to state the distance from the branch, he said he never measured it, but it was not far. This corresponds to what we have denominated as the southern location.

O. G. Taylor, who surveyed this land for Karr when he bought it in 1917, says of the beginning corner: We found a white oak snag, with two plain marks upon it, about 12 or 15 feet away he found a large pine stump and on the bank of Ivy branch, about same distance from the oak as the pine stump, he found a holly 6 or 8 inches in diameter. These trees stood in a triangular position.

This corresponds to the southern location. William Alsip surveyed this property about 1920. In his testimony he gives a poor description of this beginning corner. His survey places this original beginning corner at the northern location. Taylor testifies he thinks he saw a stake at the point where Alsip fixed this original beginning corner; that it was on a hillside. Taylor testifies there was a little ivy there, possibly 4 inches high, and a pine 25 or 30 yards away—no pine stump there.

It was agreed by the parties and ordered by the court that George Pigg should go upon and survey the disputed property, and he made such a survey and a plat showing both contentions. He says that, running as contended by Karr, this beginning corner is in a cleared field 55 feet from Ivy branch, that he found a white oak stump 40 feet to his right and possibly 40 feet from Ivy branch, and some holly sprouts growing near it. He says that in surveying this Wiggins patent as contended by Ray et al., he found at the beginning corner a stone, a white oak stump, and a pine stump, but no holly.

Andrew Davis, a man 84 years old, testifies he helped one Johnnie McKee survey this Wiggins patent 60 or 61 years ago.

This survey was made for Johnnie Reams, who was then buying this Wiggins patent from John Adams. He locates this beginning corner on west side of Ivy branch in the fork near where the two streams come together; that the call is for a white oak, pine and holly; that the pine and holly were there, and he helped plant a stone there. At the end of the fifth line of the Paris Karr patent this stone is called for. Pigg found this stone when he was surveying this property under the order of the court.

Perry Steele, a man 60 years of age, says he helped survey this Wiggins patent when it was owned by Jonas Boston; that it was surveyed by Surveyor J. C. Floyd, a very old man then; that Alston Clark showed them where to start, and in that survey they found the Wig-

gins patent well marked and the timber standing. He also helped old man Pigg survey it for D. C. Edwards, and that the beginning corner was a pine, white oak, and holly on west side of Ivy branch near it confluence with the Adam's branch.

The second corner called for in the patent is a white oak. Taylor testifies he found a white oak stump with a stone in the hollow of it, and that this was S. 5 W. 56 poles from the beginning corner, which was the correct call. Alsip says nothing of this corner. Pigg says he found no corner here when running as Karr contended; that in running this survey he saw some marked timber, but it was too young to be marks of the original patent.

As to the second corner, Taylor's survey seems more reliable than Alsip's and, if it were not for unduly extending this opinion, we could take up each line and each corner of the survey, and with one or two exceptions give good reasons for accepting Taylor's location of this patent rather than the location made by Alsip.

We have hade great difficulty in locating just where Alsip began his surveying. In his deposition he says:

"I began on a white oak, the third corner called for in the patent. It is marked 'C' on the plat. A white oak was called for as the fourth corner. Someone had placed a stone supposedly where the white oak stood. The white oak was gone. And I found a stone that had been set seemingly a long time. My line ran twenty feet to the right of it.

"Next call, S. 27 E. 56 poles to a black oak, the black oak was down, and the other timber had been marked as pointers as to where it stood."

The reader will note he says he bgan at "C" on plat. We have before us two plats Alsip made, and from which he was then testifying we cannot tell. He says in his deposition that he marks this plat "Exhibit W. H. A. No. 6." Neither is so marked. One has on it two marks, they are "Exhibit IV" and "11 P. K. No. 6." The other is marked thus: "Received by mail in good condition and filed this Oct. 19th 1925."

The first one marked Exhibit IV has a letter "C" at the corner marked on the map made part of this opinion as No. 3. The other one had a letter "C" at the corner marked on our map as No. 2. Alsip says he began at the third corner, but he also says that corner is a white

oak. The second corner calls for a white oak, and so does the fourth corner, but the first line Alsip mentions is S. 27 E. 56 poles, so, wherever he began, he probably thought he was beginning at the fourth corner. His evidence is so confusing no one can tell just where he began, but we have assumed he began at what he thought was the fourth corner, and the map accompanying this opinion locates the survey as he located it. He claims to have found a lot of marked timber and corners that looked old, but Pigg, who surveyed this property under the order of the court, says that, when he undertook to run the patent out as Karr claimed it should be, the marks he found on the timber did not appear to be old enough for the original survey.

The Wiggins patent was made in 1841, that is, almost 90 years ago, and he says the trees on which he found these marks, with exception of one tree, were from 6 to 12 inch trees. We think he is correct when he says this timber is too young. Pigg was asked which location, the one claimed by Karr or the one claimed by Ray, was the correct location of this Wiggins patent, and here is his answer: "I can't say whether either one of them is or not."

When pressed for a choice between the two, he said he thought the location as claimed by Karr was nearer than the one claimed by Ray, and on cross-examination he admitted the reason he said this was because, in locating this patent as Karr contended, the eighth corner was west of Ivy branch. If he had found any monument at this corner, we might be inclined to accept his view of it, but he found none.

Taylor in his deposition began at No. 4 on our plat, and he says:

"We began reversing; giving variations according to time, and ran N. 75 W. 28 poles, a large chestnut down, and the butt of an oak—I thought it was a chestnut, but the deed calls for a white oak and chestnut, and Hansford Storms was along to cut out a right of way to get around it. He struck the butt of this oak, and split it open, and found three plain marks in the white oak, two or more inches deep in the wood." "Then we ran N. 5 W. 70 poles to a white oak. White oak stump was there, with a stone in the hollow of it—it was a hollow tree, and

marked pointers to that tree, about 10 or 12 feet west of it was a chestnut stump, with pointers marked to it and some of the men that was along says, 'That is Tom William's corner.' Paris remarked, 'It will give me more land running to the chestnut.' Then we ran N. 5 E. 56 poles to the beginning corner, said to be a white oak, pine and holly. White oak snag there something like five feet high. The bark on the south side of this snag was standing, but on the other side it had fallen off, on the other side of it two plain marks—ax marks been hacked through the bark. Then we looked around for the other corners, about 12 or 15 feet from that was a large pine stump it has been hacked for rich pine, and no sign of marks, because it was all cut off. Then over east, on the bank of Ivy Branch, near to the branch, was a holly something like 6 or 8 inches in diameter, with sprouts grown up around it, we said, this must be the beginning corner. This holly was about the same distance from the white oak, and the pine was, and they stood in a triangular position. Then we went back to our white oak, and followed the calls around this land.''

The strongest point in Karr's favor is, that in locating this patent as Ray contends, and as we have located it, that the patent is made to cross Laurel river twice, and no mention of that is made in the original survey. It does look quite unreasonable that the man who made the survey would have failed to make mention of that stream, yet courses and distances must yield to fixed objects. This Wiggins patent contains two calls we know are erroneous, and, having two admitted errors in it to start with, the suspicion arises that there may be others. We feel that corner No. 1 as located by Surveyors Taylor, McKee, Floyd, the elder Mr. Pigg, and others is correct.

Certainly Karr fails to make such a showing as to justify us in setting aside the finding of the chancellor.

The judgment is affirmed.